1

2

3

4  **UNITED STATES DISTRICT COURT**

5  **NORTHERN DISTRICT OF CALIFORNIA**

6  JARED FLINT JACKSON,

7           Petitioner,                              No. C-07-00099 MHP

8     vs.                                            **MEMORANDUM & ORDER**

9  JAMES A. YATES, in his capacity as Warden        **Re: Petition for Writ of Habeas Corpus**
   of the Pleasant Valley State Prison,

10

11          Respondent.

12  _____/

13        Petitioner Jared Flint Jackson, a California prisoner now incarcerated at Pleasant Valley State

14  Prison, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254. Petitioner

15  claims a denial of his Sixth Amendment right to effective assistance of counsel. On April 2, 2007,

16  this court issued an order to respondent Attorney General for the State of California to show cause

17  why this court should not grant the writ. Respondent duly submitted an answer to the order, and

18  petitioner has submitted a traverse. Having considered the arguments presented and for the reasons

19  stated below, the court enters the following memorandum and order.

20

21  BACKGROUND

22        On January 22, 2004, the petitioner was charged in counts 1 and 2 with aggravated sexual

23  assault of a child under 14 years of age and 10 or more years younger than petitioner in violation of

24  Cal. Penal Code § 269; in count 4 with infliction of corporal injury upon a child in violation of Cal.

25  Penal Code § 273d(a); and in count 5 with misdemeanor child endangerment in violation of Cal.

26  Penal Code § 273a(b). Petitioner pleaded no contest to the misdemeanor count 3 charge of

27  possessing matter depicting a person under 18 years of age personally involved in sexual conduct, in

28  violation of Cal. Penal Code § 311.11.

Petitioner Jared Jackson was married to Marley Jackson, and was the stepfather of Soni and Zoe Doe. Soni was born in 1989, and was 15 years old at the time of petitioner's trial. Zoe was born in 1995 and was 8 years old at the time of the trial. At some point petitioner and his wife were separated, after which petitioner moved in with his father. Petitioner continued to maintain contact with his stepdaughters who would stay with him on the weekends at petitioner's father's house.

Soni testified at trial about an incident she alleged occurred one weekend when she was 12 or 13 years old and staying at petitioner's father's home. Resp. Exh. B, Court Reporter's Transcript, at 223. Soni stated that on Saturday night her father made her dinner and fixed her some Kool Aid. Id. at 223, 227. When Soni and petitioner sat down to eat dinner petitioner told Soni to drink all of her Kool Aid. Id. at 224. After Soni was finished with dinner, her sister Zoe ate and then Soni helped Zoe get ready for bed. Id. at 225. Within an hour Soni began to feel dizzy and tired so she laid down on the couch in the living room and fell asleep. Id. at 226. When Soni awoke, sometime later, petitioner was standing next to her. Id. at 227. Without saying anything, petitioner hit Soni on the side of the head and she fell back asleep. Id. When Soni awoke the next time petitioner was on top of her with his shirt off. Id. at 228. Petitioner had one hand on her shoulder and one hand inside her vaginal area. Id. at 229–30. Soni was unable to move, and testified that what petitioner was doing to her hurt. Id. Soni then fell back asleep and when she next woke up petitioner was still on top of her. Id. Petitioner took Soni's pants off all of the way and then penetrated her vagina with his penis. Id. at 231–32. After an undetermined amount of time Soni fell back asleep and did not wake until Sunday morning. Id. at 234. When Soni awoke she felt pain in her vagina, thighs, and breasts. Soni testified that later on Sunday as petitioner was taking her and Zoe back to their mother's house, petitioner threatened her stating, "Don't tell or you'll know what will happen." Id. at 235, 238.

Several months later a criminal case was initiated against petitioner for allegedly burning Soni with a lighter. This allegation resulted in petitioner being charged in count 4 with infliction of corporal injury upon a child in violation of Cal. Penal Code § 273d(a). Petitioner was ultimately found not guilty of this charge. Around the time that this initial action was filed against petitioner, Soni divulged to her therapist that petitioner had sexually abused her. Id. at 239–40. Subsequent to this disclosure Officer Carl Lewis ("Officer Lewis"), a criminal investigator for the Santa Clara

County District Attorney's office, began investigating the case. Id. at 373. When Officer Lewis first met with Soni on March 19, 2003, Soni told Officer Lewis about incidents of physical and sexual abuse that petitioner had committed against her. Id. at 374. This led to petitioner being charged with counts 1 and 2 of aggravated sexual assault.

On April 2, 2003, petitioner's home was searched by investigators. Id. at 314. The search resulted in the discovery of codeine, hydrocodone (commonly known as "Vicodin"), and carisprodol, drugs for which petitioner did not have a prescription. Id. at 314–15. Officer Lewis testified that the search of petitioner's home also turned up computer files containing approximately 21,000 videos and still images of pornography. Some of the files had only a string of numbers and letters associated with them whereas other files had word names. These names included, "Web Cam Lolitas," "Lolita Teen," "Lolita Sex," "15 year old having sex with an old guy," and "high school hidden cam." Id. at 378, 80. Mary Ritter, a Child Health Associate, a certified Physician Assistant, and one of the prosecution's witnesses, reviewed many of the photographs found on petitioner's computer and determined that the images and videos depicted young girls of ages ranging anywhere from 11 to 25 years old, engaged in all manner of sexual acts. Id. at 415–16. The discovery of child pornography on petitioner's personal computer lead to petitioner being charged in count 3 with a misdemeanor violation of Cal. Penal Code § 311.11 (possessing matter depicting a person under 18 years of age personally involved in sexual conduct). As stated above, petitioner plead no contest to this misdemeanor charge.

On January 28, 2004, the jury returned its verdict, finding petitioner guilty on all charges except the count 4 charge of infliction of corporal injury upon a child. On March 23, 2004, the trial court sentenced petitioner to consecutive terms of 15 years to life for counts 1 and 2, resulting in a total term of 30 years to life.

PROCEDURAL HISTORY

Petitioner appealed his conviction to the California Court of Appeal, Sixth Appellate District. In addition, on April 8, 2005, petitioner filed, a Petition for Writ of Habeas Corpus in the Sixth District Court of Appeal. On September 2, 2005, the Court of Appeal affirmed petitioner's

3

conviction and denied, without a reasoned opinion, the Petition for Writ of Habeas Corpus. On October 11, 2005, petitioner filed a Petition for Review on direct appeal in the California Supreme Court. On October 31, 2005, while petitioner's Petition for Review was still pending before the California Supreme Court, petitioner filed a Petition for Writ of Habeas Corpus in that court, pursuant to the Supreme Court's original jurisdiction. The Supreme Court denied the Petition for Review on the direct appeal on November 16, 2005. On August 30, 2006, the state Supreme Court denied, without a reasoned opinion, the Petition for Writ of Habeas Corpus.

Petitioner has filed a timely Petition for Writ of Habeas Corpus ("Petition") in this court. Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated due to numerous alleged errors by petitioner's trial counsel. The basis of petitioner's denial of effective assistance claim will be discussed below.

EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required to first exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the Petition.

LEGAL STANDARD

The court is required to analyze state habeas claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that an

> application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).

4

Accordingly, this court must review the last reasoned state court opinion under the standards outlined in AEDPA. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). The Supreme Court has interpreted AEDPA to require a district court to uphold the state court's decision unless that decision was an "objectively unreasonable" application of a clearly established federal law. Lockyer v. Andrade, 538 U.S. 63, 75 (2003). In the instant case, Jackson's Petition was denied by the Court of Appeal for the Sixth Appellate District and the State Supreme Court without a written opinion. See Resp. Exhs. G & J. Therefore, there is no last reasoned state court opinion for this court to defer to.

Where the state court gives no reasoned explanation of its decisions on a petitioner's federal claim and there is no lower court decision on a claim, the standard of review under AEDPA is different from when the state court addresses the merits of a petitioner's claim. In the absence of a reasoned state court opinion, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002); Bailey v Newland, 263 F.3d 1022, 1028 (9th Cir. 2001); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." Delgado, 223 F.3d at 982 (citation omitted). The federal court need not otherwise defer to the state court decision under AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." Greene, 288 F.3d at 1089. In sum, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v Roe, 263 F.3d 906, 914 (9th Cir. 2001).

DISCUSSION

Petitioner alleges that he was denied effective assistance of counsel, in violation of his Sixth Amendment right, based on his trial lawyer's failure to 1) consult with a forensic medical expert regarding the validity of Mary Ritter's forensic conclusions, 2) investigate and seek to introduce

5

evidence of Soni Doe's admission that she was sexually active and that this admission was made during a visit to her doctor, and 3) investigate and obtain a medical opinion regarding the veracity of adolescents who engage in self-mutilation.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 698 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. See id. The applicable standard in Strickland requires petitioner to show both that his counsel's performance was deficient and that this deficiency prejudiced the outcome of the case. See id.

The petitioner must first demonstrate that counsel's performance was deficient. This requires a showing that the lawyer made errors so serious that she did not function as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness. Id. at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id.; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

The petitioner next must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, 466 U.S. at 688. The test for prejudice is not outcome-determinative—that is, petitioner need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. Id. at 693. The petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. at 694; see United States v. Palomba, 31 F.3d 1456, 1465–66 (9th Cir. 1994) (error that may increase defendant's sentence prejudicial even if reversal would not shorten prospective jail time); Sanders, 21 F.3d at 1461 (counsel's failure to interview individual who confessed to crime and whom three eyewitnesses had identified as culprit was prejudicial); Smith v. Ylst, 826 F.2d 872,

UNITED STATES DISTRICT COURT
For the Northern District of California

875 (9th Cir. 1987) (mental incapacity of counsel does not require per se reversal of conviction; defendant has burden to point to specific errors).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as the result of the alleged deficiencies.  Strickland, 466 U.S. at 697.

Furthermore, counsel's conduct must be evaluated for purposes of the performance standard of Strickland "as of the time of counsel's conduct."  Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (citing Strickland, 466 U.S. at 690).  A difference of opinion as to trial tactics does not constitute denial of effective assistance, United States v. Mayo, 646 F.2d 369, 375 (9th Cir.), cert. denied sub. nom., Dondich v. United States, 454 U.S. 1127 (1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838 (1984).

I.      Failure to Consult an Independent Medical Expert

Petitioner claims that he was denied effective assistance of counsel based on his trial lawyer's failure to call an independent forensic medical expert to testify regarding the validity of the testimony given by the prosecutor's medical expert Mary Ritter.  The court will first discuss the testimony of Ms. Ritter as well as the declaration of petitioner's medical expert, Dr. Crawford.  The court will then analyze petitioner's claim under the line of Second Circuit authority upon which petitioner relies.

A.      Mary Ritter's Testimony

Mary Ritter, a Child Health Associate, and a certified Physician Assistant, examined Soni Doe for signs of possible child sexual abuse on April 1, 2003.  Ms. Ritter documented her findings in a letter, dated the same day as the examination, to Officer Carl Lewis.  Pet. Exh. 2, Crawford Dec., Exh. B.  Ms. Ritter also testified for the prosecution at petitioner's trial.  Ms. Ritter made two observations during Soni's examination which suggested to her that Soni may have suffered a prior penetration trauma.  First, Ms. Ritter noted that she observed "hymenal irregularities" during her examination of Soni and second, she observed what she termed a "narrowing" of Soni's hymen.

Regarding the "hymenal irregularities," Ms. Ritter testified that "instead of being a relatively smooth edge, there were projections of the hymen, there were little, kind of, raggedy looking areas sort of sticking out from the edge." Id. These findings were irregular and concerned Ms. Ritter because they were signs of a possible injury to Soni's hymen, an injury that would be indicative of a prior penetrating trauma. Id. at 407. Regarding the "narrowing" of Soni's hymen, Ms. Ritter testified that this finding was of concern because it indicated that Soni's hymen may have healed from a prior penetrating trauma. Id. at 408. Ms. Ritter stated, "[t]he narrowing is the thing that I'm really the most concerned about. Because I know that that is how injuries heal. They heal by leaving a narrow area in the bottom portion of the hymen." Id. at 409.

On direct examination Ms. Ritter indicated that there might be alternative explanations for her findings other than prior penetrating trauma.

> Q. You also talk about in your report, in your impression, that the projections at the bottom portion of a girl's hymen could be congenital. What do you mean by that?
>
> A. That means that I can't - it's possible that this girl was born with projections of the hymen. It's not a common finding, but I can't say - I haven't looked at every girl in the world, and I can't say for certain that she wasn't born with those projections. What I know is that they're not a typical finding. They're not something we see often in the children that we see. But I can't say, for certain, that those projections mean that that was from an injury; that she wasn't born with those.

Id. at 408–09.

On cross-examination, defense counsel, deputy public defender Shelyna Brown, sought to undermine the strength of Ms. Ritter's testimony. Defense counsel emphasized that Ms. Ritter was unable to rule out alternative causes of the "hymenal irregularities" identified during her examination of Soni.

> Q. And when you say - when you talk about an irregularity, I think you called it a projection, I think you put in your report that that could be congenital?
>
> A. That's right.
> . . . .
> Q. And what about, you said that it could also be developmental. What do you mean by that?
> . . . .
> A. [T]hat would be . . . related to the changes with estrogenization.
> . . . .
> And so that it's possible that there was some irregular thickening forming a projection that had developed. That's what I'm postulating as a possibility.

Q.     So when you're saying it could be congenital and/or developmental, you're trying to give other explanations?

A.     Yes.

. . . .

Q.     Is it fair to say that you don't know if it's developmental, congenital, or an injury that left those projections?

A.     It is fair to say that, yes.

Id. at 425-26.   Defense counsel also questioned Ms. Ritter regarding the evidence of "hymenal narrowing that" was noted in her report.  Ms. Ritter conceded that the observed "hymenal narrowing" could be the result something other than prior penetrating trauma; she postulated that the narrowing could be attributed to either congenital or developmental causes.  Id. at 427–29.  Additionally, defense counsel raised the issue that according to Ms. Ritter's findings Soni's posterior fourchette (the skin directly below the vaginal opening), showed no signs of prior trauma.  The posterior fourchette can be susceptible to injury from assaults similar to those Soni Doe allegedly suffered from.  Id. at 430–31.  However, defense counsel elicited from Ms. Ritter that she found Soni's posterior fourchette to be "unremarkable."  Id. at 431–32.

In closing argument the prosecutor commented on Ms. Ritter's findings.  The prosecutor stated that Soni

had hymenal protrusions and narrowing that are consistent with the healing from sexual injury.  And indeed, while Mary Ritter conceded that this could be congenital or could be developmental, her impression of it was, her conclusion from her examination of Soni Doe was that it was suggestive of prior penetrating trauma.  That these protruding and hymenal narrowing showed to her that there was prior penetrating trauma of . . . Soni's hymen.

Id. at 529.

Defense counsel in closing argument also commented on Ms. Ritter's testimony.  "What Ms. Ritter gave us was her fear or her worry that this could be caused by penetrating trauma.  And unfortunately, Ladies and Gentlemen, having a feeling is not a standard of proof.  Proof is beyond a reasonable doubt."  Id. at 560.  Defense counsel stressed that while Ms. Ritter's impression of the evidence was that it suggested prior penetrating trauma, there were other possible explanations.  Counsel stated, "the projections, and the narrowing, could be developmental, could be congenital, and it could be prior penetrating trauma."  Id.  Defense counsel offered an explanation for why Ms.

9

Ritter may have developed the impression of the evidence that she had. "I submit to you that Mary Ritter came to the conclusion she did even though she had three opinions that she could give; she came and give [sic] a certain opinion for one reason. It's her job to examine children . . . who have alleged child abuse." Id. at 560–61. Counsel stated,

> [I]t's very clear that she has a stake in what she testifies about and that she is not objective. Because if she were objective, she would have come in here and said, "Well, what I see here could be penetrating trauma. It could be congenital. It could have been developmental. I don't know. It could be either one of them." But she's not objective. And I think you need to take that into consideration.

Id.


B.      Dr. Crawford's Declaration

Petitioner has presented the declaration of Dr. James E. Crawford, M.D. Dr. Crawford is the Medical Director for the Center for Child Protection at the Children's Hospital and Research Center in Oakland, California. Dr. Crawford has held this position since 1997 and his qualifications as an expert in the area of Child Abuse Pediatrics are not contested by respondent. Dr. Crawford was asked to give his opinion on Ms. Ritter's testimony. In preparation for his declaration, Dr. Crawford reviewed the following materials: Ms. Ritter's April 1, 2003 letter to Officer Lewis; a series of 11 colposcope photographs take during that examination; Ms. Ritter's testimony at trial; and select pages of the prosecutor's closing arguments to the jury in which he described Ms. Ritter's testimony. Pet. Exh. 2, Crawford Dec. ¶ 9.

Dr. Crawford "strongly disagree[d] that the examination of Soni Doe was suggestive of prior penetrating trauma." Id. at ¶ 15. In Dr. Crawford's opinion "there is absolutely no way of determining with any degree of medical certainty whether the physical findings represent post traumatic changes to [Soni's] hymen. To say that this examination is 'suggestive of prior penetrating trauma,' . . . is to draw a conclusion that the observed physical phenomena simply does not support." Id. (emphasis in original). Regarding Ms. Ritter's testimony of the observance of a narrowing of Soni's hymen, Dr. Crawford stated that,

> [t]he colposcope photographs do not show any focal narrowing. The photographs show a slight "asymmetry" in the hymen. In my opinion, this amount of asymmetry

10

is entirely unremarkable in an adolescent girl. I respectfully, but strongly, disagree that this finding could rise to any level of certainty as to prior injury.

Id. at ¶ 16.

Dr. Crawford further remarked that "the physical findings may . . . be the result of prior injury . . . ." Id. at ¶ 18. But that in his expert opinion, "no competent medical practitioner would review these photographs and conclude with certainty, solely on the basis of this examination, that this child had been raped in the past." Id. In sum, Dr. Crawford declared that "[w]hile the physical findings are 'consistent' with the possibility of prior sexual assault, they are also 'consistent' with no past assault." Id.

### C. Analysis Under Second Circuit Authority

Petitioner relies on the Gersten, Pavel, Lindstadt line of cases from the Second Circuit to support his claim that he was denied effective assistance of counsel as a result of defense counsel's failure to seek an independent medical opinion regarding the validity of Ms. Ritter's findings. Respondent argues that petitioner's case is distinguishable from the cited line of authority. Under AEDPA, in the absence of a last reasoned state court opinion this court must determine whether an independent review of the record demonstrates that the state court "clearly erred in its application of controlling federal law." Delgado, 223 F.3d at 982 (citation omitted). "[A] review of the record is the only means of deciding whether the state court's decision was objectively reasonable." See id. Therefore, this Court will review Gersten, Pavel, Lindstadt in relation to petitioner's case to determine whether the state courts' decisions are objectively unreasonable.

### 1. Gersten v. Senkowski

In Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005), the court reviewed petitioner Gersten's successful challenge to his conviction for sexually abusing his nine year old daughter. The district court had granted Gersten's petition for a writ of habeas corpus on the grounds that he had been deprived of his right to the effective assistance of counsel. Gersten v. Senkowski, 299 F. Supp. 2d 84 (E.D.N.Y. 2004). On appeal, the Second Circuit found that Gersten's defense counsel had "essentially conceded that the physical evidence was indicative of sexual penetration without

11

conducting any investigation to determine whether this was the case." Gersten, 426 F.3d at 608. The evidence demonstrated that had Gersten's defense counsel conducted an independent investigation into the physical evidence, "exceptionally qualified medical experts could be found who would testify that [it] . . . was not indicative of sexual penetration and provided no corroboration whatsoever of the alleged victim's story." Id.

At trial the prosecution's medical expert, Dr. Silecchia, testified that her findings "were highly suggestive of penetrating trauma to the hymen and chronic irritation of the . . . posterior fourchette and perihymenal tissues; and tearing of the mucosa of the rectum due to the stretching out of the rectal mucosa-of the anal mucosa." Id. at 595. Dr. Silecchia's findings gave significant support to the alleged victim's claims of repeated sexual assault by Gersten. Despite the damning nature of Dr. Silecchia's testimony, defense counsel did not ask to review the photographs taken by Dr. Silecchia during her examination of the alleged victim in preparation for trial, nor did counsel refer to the photographs even a single time during cross-examination. Id. at 596.

In support of his habeas petition, Gersten provided the testimony of medical expert Dr. Jocelyn Brown. Upon review of Dr. Silecchia's testimony, the alleged victim's medical records, and the slides of the magnified photographs taken during the colposcope examination, Dr. Brown "concluded that the physical evidence did not appear in any respect to be indicative of penetrating trauma to the alleged victim's vagina or anus, and thus none of the medical evidence corroborated the allegations of abuse or the alleged victim's testimony." Id. at 600. Dr. Silecchia had reported that the alleged victim's "posterior fourchette" showed signs of "neovascularization" which tended to indicate the possibility of prior sexual abuse. Dr. Brown refuted these findings, stating, "such a finding is no longer considered of significance in the forensic community when evaluating children suspected of being sexually abused as the condition of 'neo-vascularization' can arise from enumerable factors unrelated to sexual abuse." Id. at 599. In essence, Dr. Brown testified that Dr. Silecchia had made findings which lacked scientific reliability. In analyzing Gersten's claim of ineffective assistance of counsel, the Second Circuit stated that,

> in a case where the only direct evidence that any crime occurred or that, if it did, the petitioner committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it

could be challenged was performance that the state court could not reasonably find to be objectively reasonable.

Id. at 608.

Petitioner Jackson's case is distinguishable from Gersten for several reasons. Petitioner Jackson does not allege that Ms. Ritter's findings are directly inconsistent with medical science. There is no evidence to suggest that Ms. Ritter based her impression of the physical evidence on science which has ever been "discouraged." Rather, the declaration of petitioner's own expert witness, Dr. Crawford, is consistent with Ms. Ritter's testimony to the extent that he states that "the physical findings may . . . be the result of prior injury . . . ." Pet. Exh. 2, Crawford Dec. ¶ 18. Neither did petitioner's defense counsel merely "concede[ ] that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case." Id. at 608. There is no evidence in the record to determine what the extent of defense counsel's investigation into the physical evidence actually was. However, counsel did seek to undermine Ms. Ritter's testimony. As discussed above defense counsel repeatedly asked, and Ms. Ritter conceded that prior penetration was not the sole explanation for her findings. Indeed, Ms. Ritter stated on cross-examination that her findings could be attributed to congenital or developmental causes, or an injury unrelated prior penetration.

In Gersten, the Second Circuit stated that had defense counsel called their own expert witness, a "strong affirmative case that the charged crime did not occur and [that] the alleged victim's story was incredible in its entirety" could have been made. Id. In the instant case however, had defense counsel called their own expert medical witness, for example, one such as Dr. Crawford, the testimony would have established essentially the same facts that defense counsel was able to demonstrate on cross-examination. While Dr. Crawford "strongly disagree[d]" with Ms. Ritter's impression, he too admits that his findings are consistent with prior penetrating trauma. Pet. Exh. 2, Crawford Dec. ¶ 15.

2.    Pavel v. Hollins

The instant case is likewise distinguishable from the Second Circuit case Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001). Kenneth Pavel ("Pavel") was charged with sexually abusing his two

13

young children.  Pavel retained defense counsel, Sanford Meltzer ("Meltzer").  Meltzer chose "not to prepare a defense for Pavel solely because he was confident that, at the close of the prosecution's presentation of its evidence, the trial judge would grant Meltzer's motion to dismiss the government's charges against Pavel." <u>Id.</u> at 216.  As Meltzer relied entirely upon his motion to dismiss being granted, he failed to prepare to call any witnesses whatsoever.  <u>Id.</u> at 212.  At the close of the government's case, Meltzer moved to have the charges against Pavel dismissed.  The trial judge, in relevant part, denied Meltzer's motion to dismiss.  Having not prepared for trial, Meltzer was left with few options and merely called Pavel to the stand and then rested without calling a single other witness.  <u>Id.</u>

Pavel based his claim of ineffective assistance of counsel in part upon Meltzer's failure to call important fact witnesses.  Despite the extraordinarily deficient nature of Meltzer's representation the Second Circuit nevertheless discussed the court's general reluctance to criticize an attorney's strategic decisions after the fact.  <u>Id.</u> at 217.  "Meltzer's decision not to call particular witnesses related to trial strategy, and . . . we have been especially hesitant to disturb such 'strategic' decisions."  <u>Id.</u> (citations omitted).  The Second Circuit stated that this general reluctance to criticize an attorney's strategic decisions is born of the reality that, "strategic choices made by an attorney whose client ends up being convicted have a way of looking especially inadequate in the bright light of hindsight."  <u>Id.</u> at n. 9 (citations omitted).  However, the court stated that while Meltzer's decision not to call certain witnesses was strategic "in *some* senses of the word, it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and been especially reluctant to disturb."  <u>Id.</u> at 218 (emphasis in original) (footnote omitted).  Meltzer's decision not to call certain witnesses was related not to the goal of providing constitutionally effective representation, but to the goal of "avoiding work."  <u>Id.</u>

The Second Circuit held that Meltzer had provided Pavel constitutionally deficient representation based on an accumulation of errors.  <u>Id.</u> at 225–26.  Of those multiple errors Meltzer's failure to call a medical expert is directly applicable to the instant Petition.  The Second Circuit stated that "Meltzer's performance was deficient to the extent that he did not call a medical expert to

14

UNITED STATES DISTRICT COURT
For the Northern District of California

testify as to the significance of the physical evidence presented by the prosecution." Id. at 223. But the court continued, stating that this decision "might well have been beyond reproach if it had been based on appropriate strategic considerations, or if it had been made by Meltzer following a sufficient investigation." Id. In making the determination that Meltzer's failure to call a medical expert constituted deficient representation, the court emphasized the fact that Meltzer's decision "had nothing to do with serving Pavel's interests," nor was it "based on pre-trial consultation with . . . [a medical] expert." Id.

The Second Circuit stated that Meltzer had an obligation to consult with a medical expert for two reasons. Id. at 224.

> First, there is no indication in the record that Meltzer had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand. . . .
> Second, there is an obvious, commonsense mismatch—which Meltzer himself recognized before trial—between (1) Matthew and David's medical indications (nothing abnormal about Matthew, and mild 'redness' in David's anal area) and (2) the allegations against Pavel (that he anally sodomized the boys once a week for four months, and that he did so with even greater frequency in the days leading up to the examination of the boys).

Id.

The instant Petition is factually distinguishable from Pavel. In the instant Petition there is no evidence that defense counsel failed to call an independent medical expert witness because she sought to avoid working on petitioner's case. Having no record of why defense counsel chose not to call an independent medical expert to rebut Ms. Ritter's testimony, the court is in the difficult position of having to surmise what her strategic motivations might have been. Given the judicial reluctance to use hindsight to criticize an attorney's strategic decisions, this court finds that a reasonable attorney could have strategically decided that it was unnecessary to call a medical expert to rebut Ms. Ritter's testimony.

As quoted above, the Second Circuit founded its decision in Pavel, that Meltzer had an obligation to consult with or call to testify a medical expert, on two main rationales. The court stated that there was no indication that Meltzer had the education or experience necessary to assess the relevant physical evidence and to make a reasonable determination on whether to call an expert.

15

In the instant action there is likewise no record of what defense counsel's education or expertise may have been regarding her ability to assess the relevant physical evidence. However, defense counsel's cross-examination of Ms. Ritter does demonstrate a competent effort to undermine the reliability of Ms. Ritter's testimony. Defense counsel secured Ms. Ritter's admission that it was a "fair statement" that the physical evidence from Soni's examination was also consistent with alternative causes besides prior penetration. Counsel established that the observed phenomena could have been congenital, developmental, or the result of an injury unrelated to prior penetration.

The strength of defense counsel's cross-examination of Ms. Ritter demonstrates that counsel had sufficient education or expertise to make a reasonable assessment of the relevant physical evidence. A reasonable attorney in defense counsel's position could have decided that it was unnecessary to consult with an expert or call one to testify because Ms. Ritter's testimony could be adequately undermined on cross-examination. Given the potential alternative causes of the noted irregularities in Soni's examination, a reasonable defense attorney could decide that calling an independent medical expert was unnecessary as the government's own expert would concede that the medical evidence could have been caused by something other than prior penetration.

An analysis of Ms. Ritter's and Dr. Crawford's findings reveals that their conclusions are not that far apart. Neither Ms. Ritter nor Dr. Crawford asserts that the only explanation of the medical evidence is prior penetrating trauma. Dr. Crawford interpreted the evidence as "non-specific" and Ms. Ritter stated that it was fair to say that the noted irregularities could be developmental, congenital, or the result of injury. Dr. Crawford stated that "no competent medical practitioner would review these photographs and conclude with certainty . . . that this child had been raped in the past." Pet. Exh. 2, Crawford Dec. ¶ 18. This statement fails to undermine Ms. Ritter's testimony. Ms. Ritter testified that it was fair to say that she could not rule out the possibility that her findings were either congenital, developmental, or the result of an injury unrelated to penetrating trauma. RT, at 425–26, 429.

Furthermore, the instant case is not analogous to Pavel in that there was not an "obvious mismatch" between the medical indications and the allegations of abuse. In Pavel, the alleged victims accused their father of repeated sodomy at least once a week for four months, and therefore

16

the medical examination should have demonstrated substantial damage to the victims.  However, the physical evidence was not indicative of any abuse in one child and only "mild redness" in the other.  In the instant action there was no "glaring mismatch" between the allegations of abuse and the physical evidence.  Id. at 224.  The medical evidence in petitioner's action was entirely consistent with Soni's allegations of abuse, and for that reason, a requirement to consult with a medical expert did not inure.

3.    <u>Lindstadt v. Keane</u>

The Second Circuit viewed <u>Pavel</u>'s facts to be substantially similar to <u>Lindstadt v. Keane</u>, 239 F.3d 191 (2d Cir. 2001).  <u>Pavel</u>, 261 F.3d at 223–24.  In <u>Pavel</u>, the Second Circuit stated that

> [b]oth cases were essentially "credibility contests": In both cases, the only witnesses to the alleged abuse were its victims and the defendant, and there was no substantial circumstantial evidence of abuse. . . . [W]hen a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence . . . is the sort of "neutral, disinterested" testimony that may well tip the scales and sway the fact-finder.

<u>Id.</u> at 224 (citation omitted).

In <u>Lindstadt</u>, petitioner Lindstadt had been convicted of sexually abusing his daughter.  Lindstadt filed a petition for a writ of habeas corpus on the basis of his numerous alleged errors on the part of his trial counsel.  Lindstadt argued these cumulative errors rose to the level of constitutionally ineffective assistance of counsel.  <u>Id.</u> at 194.  Of the four alleged errors made by Lindstadt's defense counsel, the one applicable to the instant case was defense counsel's lack of "effective challenge to the only physical evidence of sexual abuse."  <u>Id.</u>

During Lindstadt's trial, the prosecution called Dr. Milton Gordon, a pediatrician who had examined the alleged victim for signs of sexual abuse.  <u>Id.</u> at 195.  Dr. Gordon testified that the physical examination produced findings which were "consistent with sexual abuse."  <u>Id.</u>  Dr. Gordon's findings were based upon two separate scientific studies, the "Boston study" and the "McCaully review."  <u>Id.</u> at 196.  On cross-examination defense counsel sought to elicit testimony from Dr. Gordon that his findings could have been caused by events other than prior penetration, for example "horseback riding, gymnastics, masturbation, or infection."  <u>Id.</u>  Dr. Gordon, however,

17

1  relied on the "Boston study" and the "McCaully review" and rejected these proposed alternative

2  causes.  Id.

3       Lindstadt's counsel failed to request copies of the two studies cited by Dr. Gordon and the

4  Second Circuit found that had an independent medical expert been consulted, readily available

5  evidence could have been obtained that would have cast significant doubt on Dr. Gordon's findings.

6  Id. at 201–02.  The court concluded that "defense counsel's failure to consult an expert, failure to

7  conduct any relevant research, and failure even to request copies of the underlying studies relied on

8  by Dr. Gordon contributed significantly to his ineffectiveness."  Id. at 202.  The Second Circuit

9  stated that defense counsel's ability to conduct a vigorous cross-examination was "hamstrung . . . by

10  . . . [a] lack of familiarity with the studies upon which Dr. Gordon [relied]."  Id.  This dereliction had

11  a devastating effect because "Dr. Gordon testified that the (unidentified) studies ruled out every

12  theory of innocent injury . . . posited by the defense."  Id.

13       Lindstadt is likewise distinguishable from the instant case.  Again, no evidence has been

14  introduced to suggest that Ms. Ritter based her scientific findings upon studies which were not

15  generally accepted by the scientific community.  Additionally, and more importantly, Ms. Ritter,

16  unlike Dr. Gordon did not rule out potential alternative causes for the medical findings.

17          4.    Circumstantial Evidence

18       Petitioner's action is distinguishable from the Second Circuit authority because in

19  petitioner's case substantial circumstantial evidence of abuse was found during the search of

20  petitioner's home.  As stated in the background section above, police investigators found thousands

21  of images of child pornography on petitioner's computer as well as prescription drugs which could

22  have been used by petitioner to drug Soni in the manner she alleged.  The court recognizes that Ms.

23  Ritter's interpretation of that physical evidence was a key component to the prosecution's case.

24  However, the presence of circumstantial evidence undoubtedly also played an important role in

25  lending credibility to Soni's claims of abuse.  Strickland requires a dual showing that "a defendant

26  seeking reversal on this ground . . . establish both deficient performance and resulting prejudice."

27  Palomba, 31 F.3d at 1460 (citation omitted) (internal quotations omitted).  Assuming petitioner was

28  able to demonstrate that defense counsel's representation fell below an objective standard of

1 reasonableness, a finding which this court has not made, the presence of circumstantial evidence of

2 guilt undermines petitioner's claim that as a result of his counsel's alleged errors he suffered

3 prejudice rising to the level required by <u>Strickland</u>.

4     As previously stated the Second Circuit made an important correlation between <u>Pavel</u> and

5 <u>Lindstadt</u>. The court stated that both <u>Pavel</u> and <u>Lindstadt</u> were, "essentially credibility contests: In

6 both cases, the only witnesses of the alleged abuse were its victims and the defendant, and there was

7 no substantial circumstantial evidence of abuse." <u>Pavel</u>, 261 F.3d at 224 (internal quotations

8 omitted). The court continued, stating that in such credibility contests the physical evidence plays a

9 critical role, and for this reason the need to consult with or call to testify an expert witness becomes

10 more important. <u>Id.</u> While witness credibility is always an important component of how a jury

11 forms its decision, this court does not view petitioner's case as essentially a "credibility contest," on

12 the same level as <u>Pavel</u> and <u>Lindstadt</u>. In <u>Pavel</u>, the trial evidence consisted almost entirely of the

13 testimony of five prosecution witnesses and in <u>Lindstadt</u> the evidence consisted of the testimony of

14 the defendant's daughter and estranged wife and two expert witnesses. In neither case was

15 noteworthy circumstantial evidence found implicating the defendants.

16     In the instant case, the recovery of child pornography on petitioner Jackson's computer is

17 relevant circumstantial evidence of the crime of sexual abuse of a minor. In addition, illegal

18 prescription drugs were found during the search of petitioner's home, drugs which could have been

19 used by petitioner in the commission of the charged crime. This circumstantial evidence

20 corroborates Soni's allegations. For these reasons, this court finds that petitioner's case does not

21 factually fall within the cited line of Second Circuit authority.

22     Petitioner Jackson has also offered the declaration of Lidia Stiglich, an attorney licensed to

23 practice law in the State of California, who specializes in the defense of both state and federal

24 criminal cases. Ms. Stiglich states that under the circumstances of petitioner's case, where defense

25 counsel had advanced warning of Ms. Ritter's medical findings, and "where the defendant was

26 charged with crimes that carried the possibility of consecutive life sentences, defense counsel was

27 absolutely obligated to consult with an independent medical expert to determine the validity of Ms.

28 Ritter's conclusions . . . ." Pet. Exh. 3, Stiglich Dec. ¶ 13. However, petitioner has failed to support

Ms. Stiglich's conclusory statements with any reference to case law. There is no case law, either in the Ninth Circuit, or in the Second Circuit, which mandates that defense counsel under the same factual circumstances as petitioner's case consult with or a medical expert.

### 5. Review Under AEDPA

As has been discussed at length above, petitioner's case differs significantly from the line of Second Circuit authority upon which he relies. Without a reasoned state court opinion for this court to defer to, "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." Delgado, 223 F.3d at 982 (citation omitted). Based upon the significant factual differences between petitioner Jackson's case and Gersten, Pavel, and Lindstadt, this court cannot hold that it was an objectively unreasonable application of federal law for the state courts to deny petitioner's claims.

Strickland requires the petitioner to demonstrate that defense counsel made errors so serious that she did not function as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. Based upon an independent review of the record, this court finds that a reasonable defense counsel could have made the strategic decision that it was unnecessary to call an independent medical expert to refute Ms. Ritter's findings. It is undisputed that petitioner's defense counsel actively sought to undermine Ms. Ritter's testimony on cross-examination. Defense counsel repeatedly elicited Ms. Ritter's admission that her findings could be attributed to other causes besides prior penetrating trauma. Moreover, assuming petitioner was able to demonstrate that his counsel's decision constituted deficient performance, he has failed to sufficiently undermine the confidence in the outcome of the trial. Petitioner's medical expert's declaration is in large measure consistent with Ms. Ritter's testimony. Furthermore, the presence of circumstantial evidence of guilt distinguishes petitioner's case from those he relies upon and bolster's this court's confidence in the verdict. Therefore, based upon the forgoing analysis, petitioner has failed to establish that the state courts ruled contrary to or unreasonably applied Strickland when it ruled that counsel provided petitioner with constitutionally effective representation, despite the fact that she chose not to call an independent forensic expert to testify at trial.

This court's review of petitioner's claims does not end here however. Petitioner asserts that an accumulation of his trial counsel's errors amounts to constitutionally ineffective assistance of counsel in violation of his Sixth Amendment rights. This court recognizes that in some instances it is appropriate to consider the cumulative effect of several errors that otherwise viewed separately would not result in a sufficient degree of prejudice to warrant reversal. See Alcala v. Woodford, 334 F.3d 862, 893–895 (9th Cir. 2003) (recognizing cumulative effect of several errors that prevent a defendant from challenging all important elements of proof presented by the prosecution). Though this court has found petitioner's first claim of ineffectiveness to lack merit, the court must proceed to evaluate all of petitioner's claims.

II.     Soni Doe's Admission

Petitioner next asserts that defense counsel's representation was constitutionally deficient because she failed move to introduce Soni Doe's admission that she was sexually active when she successfully sought to obtain birth control pills. On February 27, 2003, Soni and her mother visited a doctor. Soni told the examining doctor that she was sexually active and that she wanted oral contraceptives. Soni stated she had been sexually active only once, about a month before the examination, and that she had used a condom for contraception for that time.

On April 15, 2003 Officer Lewis conducted an interview with Soni and questioned her about her use of birth control. Officer Lewis' report of the interview states that when he asked Soni about her birth control use she responded that it helped her suppress her acne and regulate her periods. Officer Lewis questioned Soni about whether she had been asked by the prescribing medical personnel if she was sexually active. The report states that "[Soni] said that the person did ask, and she told her yes, she was. [Soni] explained that she felt that if she said no the doctor would not have prescribed the pill for her." Pet. Exh. 3, B. Soni's statement to the medical personnel that she was sexually active ran contrary to prior statements she had made to Officer Lewis. In her interview with Officer Lewis, Soni clarified that, "she told the doctor that she was [sexually active] because she thought the doctor was not going to give her the pill." Id. Soni said that "she really wanted the pill for acne," but that "she was afraid that if she just told the doctor she wanted it for acne, then the

doctor would have referred her to an 'acne doctor'" without prescribing the birth control pills. Id.
Soni stated to Officer Lewis that "when she told the doctor she was sexually active she was not
telling the truth." Id.

At trial the prosecution took the position that Soni told Officer Lewis the truth when she
stated that she had lied to her physician in an attempt to obtain birth control. The government filed a
motion in limine to exclude any introduction of evidence of Soni's past sexual history. See Resp.
Exh. A at 273–77. At trial the court addressed the issue of whether to admit any evidence of Soni
Doe's prior sexual activity with persons other than the petitioner. The trial court stated that the
defense was permitted to "cross-examine the victim . . . as to the position of the defendant that the
victim lied to the doctor in trying to obtain a prescription for birth control pills, as regarding the
reason why she was requesting those. And that this is on the issue of the victim's credibility." Exh.
B at 161–62. The trial court continued, stating that defense counsel "will not be permitted to tell the
jury . . . that [it] was a prescription for birth control pills, since there's some evidence that she
wanted it for acne and so forth. And you're just doing it for the issue of credibility." Resp. Exh. B
at 161–62. At trial the jury was informed that, "The People and the defense stipulate that on
February 27th, 2003, Soni Doe lied to a medical doctor in order to obtain prescription medication.
The medication was not codeine, hydrocodone, carisoprodol or another other pain-related drug."
Resp. Exh. B. at 273.

Petitioner maintains that defense counsel's decision not to seek to gain admission of Soni
Doe's statement that she was sexually active falls below the standard of constitutionally effective
representation. Petitioner contends that the admission of Soni Doe's prior statement would have
been useful in several ways. Had the jury been aware that Soni Doe had previously admitted to
having been sexually active, petitioner asserts, this evidence would have undermined the
prosecution's "precocious knowledge" argument. At trial the prosecution argued that Soni Doe's
testimony that she did not bleed from the alleged assault and that the day after the assault it hurt her
to urinate, supported her allegations of abuse against petitioner. According to the prosecution these
observations were not common knowledge and not something that Soni would be expected to know.
Petitioner argues that the prosecution's precocious knowledge argument would have been discounted

1  had Soni's admission been introduced.  Petitioner states that if the jury had been made aware that

2  Soni had previously stated she was sexually active there would have been an alternative explanation

3  for her precocious knowledge regarding the after effects of sexual intercourse, i.e. that Soni had

4  previously had sexual intercourse and had learned of its effects from that experience.

5  Moreover, petitioner argues that Soni's admission would have undermined the strength of

6  Ms. Ritter's testimony.  Petitioner argues that had the jury been made aware of Soni's statement and

7  believed that Soni was telling the truth to her doctor, Ms. Ritter's observations would have been

8  given considerably less weight.  The irregularities and narrowing of Soni's hymen could have been

9  explained by prior sexual activity unrelated to the alleged sexual abuse by petitioner.

10  In support of petitioner's claims, petitioner again offers the declaration of Lidia Stiglich,

11  petitioner's criminal defense expert.  Ms. Stiglich stated in her declaration that Soni's efforts to

12  obtain birth control pills were "highly exculpatory" for petitioner.  Pet. Exh. 3, Stiglich Dec. ¶ 22.

13  Ms. Stiglich viewed this admission as exculpatory because she reasoned that it would have

14  undermined Ms. Ritter's testimony and the prosecution's precocious knowledge argument.  Id. at ¶

15  21.  Ms. Stiglich stated, "I cannot think of a tactical reason that would lead a competent attorney to

16  believe [Soni's admission to her doctor] should not have been place before the jury. . . . In a close

17  case, as this was, the failure to seek to introduce such evidence is sheer ineffective assistance."  Id. at

18  ¶ 22.

19  Respondent argues that the California Supreme Court's rejection of petitioner's ineffective

20  assistance claim was not contrary to or an unreasonable application of the Strickland standard.

21  Respondent argues that it was reasonable for defense counsel to agree to the stipulation, as defense

22  counsel was then given an avenue to challenge Soni Doe's credibility.  As a result of the stipulation

23  the jury knew that Soni Doe had lied to her doctor and defense counsel could challenge Soni's

24  credibility based upon this fact.  Respondent states that petitioner has only managed to demonstrate

25  that another attorney could have chosen a different defense strategy, but not that the chosen strategy

26  of petitioner's counsel was constitutionally deficient.

27  In Strickland, the Supreme Court "cautioned . . . that a court must indulge a 'strong

28  presumption' that counsel's conduct falls within the wide range of reasonable professional assistance

23

because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell v. Cone</u>, 535 U.S. 685, 702 (U.S. 2002) (quoting <u>Strickland</u>, 466 U.S. at 689). Further, this court under AEDPA may only grant a writ of habeas corpus if the state court ruled contrary to or unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d)(1). This court finds that defense counsel's decision not to seek admission of Soni Doe's February 27, 2003 statement did not constitute deficient performance. Where reasonable lawyers will disagree about the proper trial strategy a finding of ineffective assistance of counsel cannot be made. Additionally, petitioner has not demonstrated sufficient prejudice from his counsel's alleged omission to undermine this court's confidence in the outcome of his trial. Therefore, pursuant to AEDPA, this court cannot say that the state courts' ruling were contrary to or involved an unreasonable application of <u>Strickland</u>.

III.     <u>Medical Opinion Regarding the Veracity of Adolescents who Engage in Self-mutilation</u>

Petitioner's final challenge to his counsel's performance is based upon her failure to investigate and obtain a medical opinion regarding the veracity of adolescents who engage in self-mutilation. Petitioner's medical expert, Dr. Crawford, states

> in my experience, self-mutilation is a common issue in individuals with serious underlying mental health issues. Depending on the underlying mental health disorder, false allegations may be a serious concern. When I am working with a patient who engages in this behavior, I routinely share with the investigators my concern that mental health issues should be assessed, in order to better understand whether a disclosure is reliable or not.

Pet. Exh. 2, Crawford Dec. ¶ 21. Relying on Dr. Crawford's statements, petitioner argues that defense counsel's representation was deficient. According to petitioner had the jury heard this evidence the prosecution would not have been free to argue that Soni Doe's credibility was unimpeachable.

It is important to note that defense counsel did attempt to introduce some evidence that Soni Doe was engaged in self-mutilation. On cross-examination defense counsel asked Soni's therapist whether she had observed that Soni had engaged in self-mutilation. The therapist answered yes, but the prosecutor then objected on the grounds of relevance and the answer was stricken. RT at 289.

1   Assuming that defense counsel had found a proper method to introduce into evidence the fact that

2   Soni had engaged in self-mutilation, petitioner has failed to establish that defense counsel's

3   performance fell below the reasonableness standard.  Dr. Crawford states that self-mutilation is a

4   symptom of "serious underlying health issues" and that depending on the underlying disorder "false

5   allegations may be a serious concern."  This evidence, even if it had been submitted to the jury, fails

6   to show that defense counsel's decision not to pursue this strategy was deficient.  A reasonable

7   defense counsel could have decided that introducing evidence about Soni's self-mutilation might

8   have damaged the defense's case more than helped it.  If self-mutilation is a symptom of underlying

9   mental health problems a reasonable trier of fact could decide that this evidence is further

10   corroboration of Soni's allegations of sexual abuse by petitioner.  The fact that Soni is a highly

11   troubled teen is consistent with her allegations of sexual abuse.  As stated earlier a difference of

12   opinion as to trial tactics does not constitute denial of effective assistance of counsel.  Mayo, 646

13   F.2d at 375.  This court finds that at most, petitioner has established that there existed alternative

14   courses of action that reasonable attorneys may have taken.  This showing falls well short of that

15   required by the Supreme Court pursuant to Strickland.

16       Therefore, pursuant to Alcala, 334 F.3d 862 (9th Cir. 2003), when weighing the cumulative

17   effect of defense counsel's alleged errors petitioner has failed to carry his burden under AEDPA.  An

18   independent review of the record, as required in cases such as this, does not demonstrate that either

19   the California Supreme Court or the Court of Appeal for the Sixth Appellate District unreasonably

20   applied or ruled contrary to settled federal law.

21

22

23

24

25

26

27

28

CONCLUSION

For the foregoing reasons, the court hereby DENIES the petition for writ of habeas corpus. It declines to order a new trial or hold an evidentiary hearing on the claims.

IT IS SO ORDERED.

Dated: January 7, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California